IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LENOX CORPORATION, | : | |
| Plaintiff, | : | CIVIL ACTION |
| | : | No. 15-6019 |
| v. | : | |
| THOMAS BLACKSHEAR, ROGER W. RAWLS, BLACKSHEAR ENTERPRISES INC., and KEEPSAKES AND COLLECTABLES, LLC., | : | |
| | : | |
| Defendants. | : | |

**December 22, 2016**                                                                Anita B. Brody, J.

**<u>Memorandum</u>**

Plaintiff Lenox Corporation ("Lenox") brings suit against Defendants Thomas Blackshear, Roger W. Rawls, Blackshear Enterprises, Inc., and Keepsakes and Collectables, LLC[1] alleging trademark infringement, unfair competition, and false advertising in violation of the Lanham Act, 15 U.S.C. § 1051 *et seq*. Lenox also brings several state law claims. Subsequent to Lenox filing the Complaint, Blackshear initiated an arbitration action in California alleging similar causes of action. Blackshear moves to stay this action pending the outcome of arbitration. Lenox moves to enjoin the arbitration to allow this litigation to proceed. I exercise jurisdiction over this dispute pursuant to federal question jurisdiction, 28 U.S.C. §§ 1331 and 1338, and supplemental jurisdiction, 28 U.S.C. § 1367.

I.   **BACKGROUND**

Thomas Blackshear is a celebrated American artist whose art depicts African American

---

[1]   Defendants are collectively referred to as "Blackshear" unless otherwise indicated.

1

themes and characters. He conducts business through Blackshear Enterprises, Inc., a Colorado corporation with its principal place of business in Colorado Springs, Colorado. Blackshear works with Roger W. Rawls, a Georgia resident who sells products through Keepsakes and Collectables, LLC, a limited liability company operating in Georgia.

Sometime in the 1990s, Blackshear first contracted to sell his figurine designs to Willitts Designs International ("Willitts").[2] Willitts and Blackshear engaged in a productive business relationship in which Blackshear provided designs and artwork to Willitts, who in turn produced and sold figurines and other collectible items based upon those designs. As part of that relationship, Blackshear served as representative of a product line entitled "Thomas Blackshear's Ebony Visions," signed collectible figurines from the line, attended product events, and collected royalties from the sale of Willitts' products.

In June 1999, in furtherance of their arrangement and pursuant to the trademark registration process, Blackshear entered into a "Consent to Use and Registration of Name" agreement (the "Consent Agreement") with Willitts. In this agreement, Blackshear assented to the use and registration by Willitts of his name as a trademark in connection with the sale of figurines and other items. Thereafter, Willitts registered the mark, "Thomas Blackshear's Ebony Visions," (the "Ebony Visions Mark") with the United States Patent and Trademark Office ("USPTO"). The Consent Agreement was appended to each of two trademark applications.[3] Blackshear continued to contract with Willitts, providing design services to Willitts and its sculptors for the "Thomas Blackshear's Ebony Visions" line of products. Willitts subsequently

---

[2] Neither party provides documentation of when their relationship began. *See infra* note 4.
[3] There are two registration applications and approvals for "Thomas Blackshear's Ebony Visions." The trademark applications are listed as Ser. No. 75,756,912, filed on July 20, 1999, and Ser. No. 75,756,916, filed on July 21, 1999. The corresponding registration numbers are 2,565,712 and 2,443,448. Both registrations are for "Thomas Blackshear Ebony Visions," one for the use of the Mark with Figurines and Sculptures made of Resin, and the other for the use of the Mark with Collector Plates and Figurines made from other materials. *See* Exs. B and C, Pl. Lenox Corp.'s Mot. to Enjoin Arbitration, ECF No. 19.

marketed and sold these products under the trademark.

In 2004,[4] Blackshear and Willitts' relationship was memorialized in an Amended and Restated Design Services and Compensation Agreement ("DSA"). DSA, attached as Ex. A to Defs.' Mot. to Stay, ECF No. 9. Under the DSA, Blackshear agreed to provide concepts for and facilitate the design of figurines, accessories, jewelry, dolls, collectors' plates, and ornaments based on his artwork. He agreed these designs would become products, made by Willitts, to be sold under the "Thomas Blackshear's Ebony Visions" trademarks.[5] The DSA confirmed Willitts' rights in the Ebony Visions Mark:

> Designer[6] shall acknowledge Company's[7] exclusive rights in the Property and the Trademarks and acknowledges that the Property and/or Trademark are owned by Company. Designer shall not dispute or contest, directly or indirectly Company's exclusive right and title to the Property and/or Trademarks or the validity thereof.

DSA § 9.C.

The DSA contains a "Jurisdiction and Disputes" section. This section states:

> All disputes arising out of this Agreement shall be submitted to mediation in accordance with the rules of Arts Arbitration and Mediation Services ["AAMS"], a program of California Lawyers for the Arts. If mediation is not successful is [sic] resolving the entire dispute, any outstanding issues shall be submitted to final and binding arbitration in accordance with the rules of that program. The arbitrator's award shall be final, and judgement may be entered upon it by any court having jurisdiction thereof. If any party hereto is required to institute arbitration to enforce its rights under this Agreement, or to have the meaning of any of its terms and provision over which there is a dispute declared and determined by arbitration, the prevailing party shall be entitled to reasonable

---

[4] The 2004 Agreement made reference to a prior agreement, the "Design Services and Compensation Agreement dated June 21, 1994," noting that the parties "wish to extend the term of the Prior Agreement on the terms and conditions set forth in this Amended and Restated [DSA]." Neither party has provided a copy of that original agreement, but both agree that the 2004 version is the operative contract. See Tr. of Mot H'rg 6:3-10, September 7, 2016.

[5] There are three other trademarks listed in the 2004 Design Services Agreement: "Thomas Blackshear," "The Blackshear Circle," and "The Blackshear Jamborree Parade." *See* Schedule A, DSA, attached as Ex. A to Defs.' Mot. to Stay, ECF No. 9. Although Lenox asserts that they own three of those trademarks, Am. Compl. ¶ 27, both parties agreed on the record at the September 7, 2016 Motion hearing that the only trademark in dispute is "Thomas Blackshear's Ebony Visions." Tr. of Mot. H'rg 3:9-5:7, September 7, 2016.

[6] The preamble to the agreement identifies Thomas Blackshear as "DESIGNER."

[7] The preamble to the agreement identifies Willitts Designs International, Inc., as "COMPANY."

>attorney's fees as awarded by the arbitrator in addition to all other recoverable costs and damages.

DSA § 17.B. Section 17.C adds: "Both parties shall have the right to seek assistance with disputes arising solely out of this Agreement using binding arbitration and/or mediation." DSA § 17.C. The DSA also contains a choice of law provision that states that it is "governed in accordance with the laws of the State of California." DSA § 17.A.

In March 2009, Lenox, a Delaware corporation with its principal place of business in Bristol, Pennsylvania, acquired Willitts' assets through an Asset Purchase Agreement, pursuant to an order of the Bankruptcy Court in the Southern District of New York. The assets Lenox purchased included the Ebony Visions Mark and the Design Services Agreement with Blackshear. According to that order, Lenox acquired full title to the assets it purchased, free and clear of any and all liens, claims, interests, and encumbrances in the assets, including the Ebony Visions Mark. *See* Order ¶ R, attached as Ex. 1 to Resp. to Mot. to Dismiss or Stay Pending Arbitration, ECF No. 14. Lenox has been listed as the registered owner of the Ebony Visions Mark since the 2009 asset purchase, and is the current owner of the Mark. *See* Trademark Registration and Assignment Information from USPTO, attached as Exs. C and D to Pl. Lenox Corp.'s Mot. to Enjoin Arbitration, ECF No. 19; Am. Compl. ¶ 33.

In 2013, Blackshear and Lenox decided to discontinue their relationship. On June 30, 2013, the DSA terminated. While Blackshear is no longer obliged to provide designs to Lenox, Lenox continues to sell existing and new products under the Ebony Visions Mark. Lenox claims that prior to and since the expiration of the DSA, Blackshear has taken various actions that have diluted the Ebony Visions trademark and disrupted its commercial relationships. Lenox alleges that beginning in 2012, Defendant Roger W. Rawls and his company, Defendant Keepsakes and Collectibles, LLC, purchased 4,200 products from Lenox, the majority of which are from the

"Thomas Blackshear's Ebony Visions" product line. Defendants together began selling these products on their website, BlackshearOnline.com, without Lenox's permission and without identifying them as "Thomas Blackshear's Ebony Visions" products. Lenox alleges that in March 2014, Blackshear published a statement to the relevant market—retailers, collectors, and other target consumers of the Ebony Visions line—noting that the "19-year run of Ebony Visions by Thomas Blackshear comes to an end." Lenox alleges this statement directed customers to contact Rawls via email at roger@blackshearonline.com if they need "figurines to complete [their] Ebony Visions collection." Am. Compl. ¶ 62, ECF No. 7.

Lenox further alleges that in July 2014, Blackshear issued a statement to customers stating that he "did not participate in or approve [Lenox's] redesigns and will not participate in or approve future redesigns of his past Ebony Visions releases." Lenox claims Blackshear stated that he was not signing any Lenox items bearing the Ebony Visions name and that signatures on certain products may not be genuine. Am. Compl. ¶ 75, ECF No. 7. Finally, Lenox alleges that in late 2014 and early 2015, Blackshear designed and marketed two angel figurines through the website https://www.blackgifts.com: (1) "The Sound of Victory" and (2) "Ready for Battle." Lenox asserts that these products are derivatives of a figurine designed for Lenox, "Sentinel Angel," and therefore interfere with Lenox's marketing of "Sentinel Angel." Am. Compl. ¶ 100-103, ECF No. 7

Lenox alleges that Defendants' actions have created confusion in the marketplace and diluted Lenox's trademark. Lenox asserts that Defendants, by representing Lenox's trademarked goods as their own and inviting customers to purchase these products from the Blackshearonline website, have engaged in reverse passing off by selling Lenox's trademarked products as their own. On November 5, 2015, Lenox filed a complaint in this Court asserting ten claims: (1) Unfair Competition in violation of 15 U.S.C. § 1125(a); (2) Unfair Competition in violation of

73 P.S. §201-2(4); (3) Trademark Infringement in violation of 15 U.S.C. §1125; (4) False Advertising in violation of 15 U.S.C. §1125; (5) False Advertising in violation of Pennsylvania common law; (6) Unfair Competition in violation of Pennsylvania common law; (7) Unjust Enrichment requiring an accounting in violation of Pennsylvania common law; (8) Tortious Interference with business relationships in violation of Pennsylvania common law; (9) Conspiracy to tortuously interfere with business relationships in violation of Pennsylvania common law; and (10) Trade Libel in violation of Pennsylvania common law. ECF No. 1. The Complaint was amended on March 17, 2016. ECF No. 7.

Subsequent to the filing of Lenox's complaint, Blackshear concluded he was also aggrieved by their arrangement. He claims he was not paid royalties owed to him under the DSA. He seeks to remedy this, as well as establish his ownership of the "Thomas Blackshear's Ebony Visions" trademark. On March 31, 2016, in conjunction with a motion to dismiss, Blackshear and Defendants moved to stay this matter pending arbitration. ECF No. 9. Pursuant to Section 17.B of the DSA, they argue that this dispute arises out of that agreement and is therefore subject to the arbitration provision. Next, on April 14, 2016, while the Motion to Stay was pending, Blackshear initiated the arbitration proceeding before the Arts Arbitration and Mediation Service ("AAMS") in California. He asserted nine claims against Lenox: (1) Breach of Contract; (2) Trademark Infringement under the Lanham Act; (3) False Endorsement under the Lanham Act; (4) Unfair competition under Cal. Bus. & Prof. Code §17200; (5) False Advertising under Cal. Bus. & Prof. Code §17500; (6) Unfair Competition under California common law; (7) Violation of California Civil Code § 3344; (8) Violation of California common law right of publicity; and (9) Declaration of Non-Liability to Respondent under Declaratory Judgment Act. *See* Demand for Arbitration, attached as Ex. A to Pl. Lenox Corp.'s Mot. to Enjoin Arbitration, ECF No. 19.

Lenox moves to enjoin this ongoing arbitration. ECF No. 19.

## II.      LEGAL STANDARD

The Federal Arbitration Act, 9 U.S.C. § 1 *et seq.*, ("FAA"), "creates a body of federal substantive law establishing and governing the duty to honor agreements to arbitrate disputes." *Century Indem. Co. v. Certain Underwriters at Lloyd's, London*, 584 F.3d 513, 522 (3d Cir. 2009). "Congress designed the FAA to overrule the judiciary's longstanding reluctance to enforce agreements to arbitrate and its refusal to put such agreements on the same footing as other contracts, and in the FAA expressed a strong federal policy in favor of resolving disputes through arbitration." *Id.* (citations omitted). "In particular, the FAA provides that as a matter of federal law '[a] written provision' in a maritime or commercial contract showing an agreement to settle disputes by arbitration 'shall be valid, irrevocable, and enforceable, save upon such grounds as exist in law or in equity for the revocation of any contract.'" *Id.* (quoting 9 U.S.C. § 2).

Section 3 of the FAA states that when a suit is brought upon a claim subject to arbitration, a district court must stay the litigation to allow the arbitration to proceed. The statue provides:

> If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

9 U.S.C. § 3.

Resolving a motion to stay under Section 3 calls for a two-step inquiry. "[A] court asked to stay proceedings pending arbitration must determine [1] whether there is a valid agreement to arbitrate and, if so, [2] whether the specific dispute falls within the substantive scope of that

agreement . . . ." *Medtronic AVE, Inc. v. Advanced Cardiovascular Sys., Inc.*, 247 F.3d 44, 54–55 (3d Cir. 2001). A court asked to enjoin an ongoing arbitration must undertake the same inquiry. *See PaineWebber, Inc. v. Hartmann,* 921 F.2d 507, 511 (3d Cir. 1990) ("If a court determines that a valid arbitration agreement does not exist or that the matter at issue clearly falls outside of the substantive scope of the agreement, it is obliged to enjoin arbitration.").

The FAA creates a presumption in favor of arbitration. This presumption, however, "does not apply" to step one of our inquiry, namely, "to the determination of whether there is a valid agreement to arbitrate between the parties." *Kirleis v. Dickie, McCamey & Chilcote, P.C.*, 560 F.3d 156, 160 (3d Cir. 2009) (quotations omitted). "The strong federal policy favoring arbitration . . . does not lead automatically to the submission of a dispute to arbitration upon the demand of a party to the dispute." *Century Indem. Co.*, 584 F.3d at 523.

Once a court reaches step two of the inquiry, the presumption in favor of arbitration applies. *Id.* at 524. A district court is then directed to proceed to investigate the scope of the arbitration provision, and to find out if the dispute at issue falls under the scope of the clause. *Medtronic AVE, Inc.*, 247 F.3d at 54–55. A court is presumed to decide whether or not a claim is arbitrable—the threshold question of arbitrability—but the parties can require an arbitrator to make this decision if they clearly and unmistakably delegate the question to the arbitrator. *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995).

### III.   FRAMEWORK OF THE DISPUTE

I have jurisdiction over this case because Lenox filed a complaint pursuant to a federal statute, the Lanham Act. *See* 28 U.S.C. §§ 1331, 1338. A claim under the Lanham Act can only be prosecuted by the owner of a trademark. Lenox's complaint alleges that Blackshear's conduct has infringed on a trademark, the Ebony Visions Mark, which Lenox claims it owns. Blackshear

moves to stay this litigation because, he alleges, the ownership of the Ebony Visions Mark is derived from the DSA, and therefore the dispute must be arbitrated. Lenox moves to enjoin the arbitration because it argues that it owns the Ebony Visions Mark irrespective of the DSA. The crux of this dispute is therefore the source of the ownership of "Thomas Blackshear's Ebony Visions" and the rights attendant to that ownership.

In resolving a motion to stay litigation pending arbitration and a motion to enjoin arbitration, a court must first determine if the parties agreed to arbitrate *any* dispute. Once a valid arbitration agreement is found, a court must determine if the parties intended an arbitrator or a court to investigate the scope of the arbitration agreement at issue. This is the threshold question of arbitrability. Then, if jurisdiction of the court is proper, a court must determine if *this dispute* falls under the scope of the arbitration provision.

The parties do not question that a valid agreement to arbitrate exists. Blackshear, however, argues that, pursuant to the DSA, the arbitrator must decide whether or not this dispute is subject to arbitration. But courts are presumed to determine arbitrability unless the parties clearly and unmistakably provide, in the agreement, that they intended arbitrability to be determined by the arbitrator. I find as a matter of California law, the law designated in the DSA, that the agreement does not speak to the threshold question of arbitrability. Therefore I have jurisdiction to decide the scope of the arbitration provision in this matter.

Blackshear argues that "all" of Lenox's claims are within the scope of the arbitration provision of the DSA, because of, they allege, Lenox's "erroneous belief that [Lenox] continues to hold rights to manufacture and sell goods" under the Mark. Mot. to Stay 15, ECF No. 9. Lenox asserts that "eight of the nine claims" raised by Blackshear in the AAMS arbitration are premised on ownership of the Ebony Visions Mark and the rights commensurate with that

ownership.

I find that a valid agreement to arbitrate exists, but that the parties did not agree to arbitrate the threshold question of arbitrability. I therefore decide whether or not this dispute falls under the scope of the arbitration agreement. Lenox does not meet its burden to overcome the presumption in favor of arbitration. I will therefore grant Defendants' Motion to Stay this matter pending arbitration. ECF No. 9. I will deny Plaintiff's Motion to Enjoin the arbitration ECF No. 19.

## IV. DISCUSSION

### i. A valid agreement to arbitrate exists.

It must first be determined if a valid agreement to arbitrate exists between the parties. *Kirleis*, 560 F.3d at 160. This prong requires little inquiry. There is no dispute that the DSA was valid when executed and binds both parties to this dispute. *See* Tr. of Mot H'rg 11:2-7; 14:21-15:1, September 7, 2016.

### ii. This Court determines the threshold question of arbitrability.

The threshold question of arbitrability—whether a judge or arbitrator decides if a claim is arbitrable—is "undeniably an issue for judicial determination." *AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986). The parties may provide otherwise, but there is a presumption that a judge decides whether or not a case is arbitrable. *Id*. "Courts should not assume that parties agreed to arbitrate arbitrability" and should "hesitate . . . [to] force unwilling parties to arbitrate a matter they reasonably would have thought a judge, not an arbitrator, would decide." *First Options,* 514 U.S. at 944-45.

The general rule is that courts apply state law in determining if parties agreed to arbitrate, including the threshold question of arbitrability. *Id*. "We determine whether a party [has agreed

to arbitrate] by applying ordinary state-law principles . . . ." *Century Indem. Co*, 584 F.3d at 524 (quotations omitted); *see First Options*, 514 U.S at 944 ("When deciding whether the parties agreed to arbitrate a certain matter (including arbitrability), courts generally . . . should apply ordinary state-law principles that govern the formation of contracts."); *see also Chesapeake Appalachia, LLC v. Scout Petroleum, LLC,* 809 F.3d 746, 761 (3d Cir. 2016)*, cert. denied,* 137 S. Ct. 40 (2016).[8]

First, state law is applicable to discern the substance of the parties' agreement—did they agree to arbitrate the threshold question of arbitrability? Courts must look to the "relevant state law . . . to see whether the parties objectively revealed an intent to submit the arbitrability issue to arbitration." *First Options*, 514 U.S at 944; *see also Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 630–31 (2009). If the agreement at issue, as construed by state law, does *not* show that the parties intended the arbitrator to answer the threshold question of arbitrability, there is nothing to overcome the presumption of judicially determined arbitrability. In this case, the DSA states that California law applies to the agreement. DSA §17.A.

Lenox argues that the DSA does not provide for the arbitrator to decide the threshold question of arbitrability, and therefore the arbitrator cannot decide the issue. Blackshear argues that the DSA is not truly silent on this issue because it incorporates by reference the 2015 rules of the Arts Arbitration and Mediation Service ("2015 AAMS rules"). Blackshear claims the 2015 AAMS rules apply to the DSA, and that those rules call for arbitrability to be determined by the arbitrator. Although the DSA does not directly address the threshold question of arbitrability, it provides that:

---

[8] If ordinary state law principles indicate that the parties agreed to have an arbitrator decide the scope of the arbitration clause, then, as a matter of federal law, courts should not defer to the arbitrator unless there is "clear and unmistakable evidence" that the parties intended to arbitrate this initial question. *First Options*, 514 U.S at 944 (quotations omitted).

11

> All disputes arising out of this Agreement shall be submitted to mediation in accordance with the rules of Arts Arbitration and Mediation Services, a program of California Lawyers for the Arts. If mediation is not successful is [sic] resolving the entire dispute, any outstanding issues shall be submitted to final and binding arbitration in accordance with the rules of that program.

DSA §17.B.

The 2015 AAMS rules provided by Blackshear state that: "[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement." R-7(a), AAMS Arbitration Rules and Procedures, attached as Ex. B to Defs.' Mot. to Stay, ECF No. 9. The central issue is whether the 2015 AAMS rules were incorporated into the DSA in 2004.

Under California law, an ancillary document is incorporated by reference into a contract if "[t]he reference to the incorporated document [is] clear and unequivocal and the terms of the incorporated document [are] known or easily available to the contracting parties." *Slaught v. Bencomo Roofing Co.*, 30 Cal. Rptr. 2d 618, 621 (Cal. Ct. App. 1994). "[I]n order to make out a case for the application of the doctrine of incorporation by reference, the paper referred to must [] be in existence at the time of the execution," of the agreement. *In re Plumel's Estate*, 151 Cal. 77, 80 (1907). As the California Court of Appeals has explained, it makes little sense "[t]o go beyond the incorporation of an *existent* rule and allow for the incorporation of a rule that might not even come into existence in the future . . . ." *Gilbert St. Developers, LLC v. La Quinta Homes, LLC*, 94 Cal. Rptr. 3d 918, 924 (Cal. Ct. App. 2009). The court held:

> Incorporating the *possibility* of a *future* rule by reference simply doesn't even meet the basic requirements for a valid incorporation by reference under simple state contract law. Most basically, what is being incorporated must *actually exist at the time of the incorporation,* so the parties can know exactly what they are incorporating.

*Id.*; *see Yahoo! Inc. v. Iversen*, 836 F. Supp. 2d 1007, 1012 (N.D. Cal. 2011) (*"*Incorporation of

the [American Arbitration Association ("AAA")] rules by reference constitutes clear and unmistakable evidence that the parties intended to submit the question of arbitrability to the arbitrator, so long as what is being incorporated actually exists at the time of incorporation . . . ." (quotations omitted)).

The DSA "clearl[y] and unequivocal[lly]" references the AAMS rules. *Slaught*, 30 Cal. Rptr. at 621. But it is unclear whether the parties intended to incorporate the future rules of the AAMS or the rules in effect at the time the 2004 agreement was executed. If the parties meant the future rules, i.e. the 2015 AAMS rules, under California law they would not have been validly incorporated because they were not in existence at the time the agreement was signed. *In re Plumel's Estate*, 151 Cal. at 80.

If the parties intended to incorporate the AAMS rules in force in 2004, those rules have not been provided by Blackshear. Because the presumption is that a court decides the scope of the arbitration agreement, if Blackshear wished to have the arbitrator decide which claims were subject to arbitration, he was required to produce the operative rules in force at the time the DSA was executed. Also, publicly available information strongly suggests that the rule that gives the arbitrator the power to determine the scope of the arbitration clause did not exist in the AAMS rules in 2004. An internet archive shows that as of 2007, the AAMS website linked to an earlier version of the AAMS rules that did not contain such a rule. *See* AAMS Arbitration Rules link, California Lawyers for the Arts (Feb. 5, 2007), *https://web.archive.org/web/20070613041645 /http://www.calawyersforthearts.org/conflictresolution.html* (last visited December 21, 2016).

The parties did not and could not incorporate the 2015 AAMS rules into the DSA in 2004. They incorporated an earlier version of the AAMS rules, and those rules have not been produced and appear to be silent as to the threshold question of arbitrability. The DSA itself,

13

pursuant to California law, is therefore also silent as to the threshold question of arbitrability. *Gilbert St. Developers, LLC*, 94 Cal. Rptr. at 924. When the agreement does not address who decides arbitrability, there is no evidence to rebut the presumption that a judge determines if the dispute is arbitrable. Therefore, I determine the scope of the arbitration clause.[9]

### iii. This dispute falls under the scope of the arbitration clause.

Once a court finds that a valid agreement to arbitrate exists and that it is the court's responsibility to decide the threshold issue of arbitrability, it must then be decided if the dispute arising from the complaint falls under the scope of the arbitration provision. If the dispute as alleged in the complaint falls under the arbitration clause, the court must send the dispute to the arbitrator for adjudication. If the dispute before the court does not fall under the arbitration clause, the court, of course, must decide the merits itself.

A presumption in favor of arbitrability arises when the court investigates the scope of an arbitration clause.[10] *Century Indem. Co*, 584 F.3d at 524. This presumption is only overcome

---

[9] I do not need to invoke the "clear and unmistakable" test when state law dictates that the parties did not agree to arbitrate arbitrability. The federal "clear and unmistakable" test is only triggered if state law first demonstrates that the parties intended, in their contract, to arbitrate arbitrability. *First Options*, 514 U.S at 944. If the agreement at issue, as construed by state law, does *not* show that the parties intended the arbitrator to answer the threshold question of arbitrability, there is no need to employ the federal "clear and unmistakable" test, and the presumption in favor of judicially determined arbitrability is not rebutted.
  Although "[v]irtually every circuit to have considered the issue has determined that incorporation of the [American Arbitration Association ("AAA")] arbitration rules constitutes clear and unmistakable evidence that the parties agreed to arbitrate arbitrability," *Chesapeake Appalachia, LLC*, 809 F.3d at 763 (listing cases), those cases do not address the situation where relevant state law dictates that the document referenced was not validly incorporated.

[10] Defendants argue that California law governs the determination of the scope of the arbitration provision and the significance of the "arising under" language. *See* Defs.' Reply Mot. Stay at 9, ECF No. 18. While ordinary state law principles apply to the first prong—whether or not the parties agreed to arbitrate *any* disputes—federal law governs the second prong—whether nor not a particular dispute falls within the scope of the arbitration clause. *Century Indem. Co.*, 584 F.3d at 524. A dispute about the scope of an arbitration clause under the FAA, "is properly characterized as arising under the body of federal law regulating interstate commerce," and "[f]ederal law therefore applies to [the] determination of the scope of th[e] arbitration agreement." *Mediterranean Enterprises, Inc. v. Ssangyong Corp.*, 708 F.2d 1458, 1463 (9th Cir. 1983); *see Century Indem. Co.*, 584 F.3d at 524 ("Inasmuch as federal law applies to the interpretation of arbitration agreements, once a court has found that there is a valid agreement to arbitrate . . . the determination of whether a particular dispute is within the class of those disputes governed by the arbitration clause ... is a matter of federal law.") (quotations omitted).

with "positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *AT & T Techs., Inc.*, 475 U.S. at 650 (quotations omitted). To establish "positive assurance," the party seeking to avoid arbitration "must either: (1) establish the existence of 'an[ ] express provision excluding [the] grievance from arbitration'; or (2) provide "the most forceful evidence of a purpose to exclude the claim from arbitration." *Lukens Steel Co. v. United Steelworkers of Am. (AFL-CIO)*, 989 F.2d 668, 673 (3d Cir. 1993) (quoting *AT & T Techs., Inc.,* 475 U.S. at 650). "[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration . . . ." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983). "[I]n deciding whether the parties have agreed to submit a particular grievance to arbitration, a court is not to rule on the potential merits of the underlying claims." *Lukens Steel Co.*, 989 F.2d at 672 (quotations omitted).

Lenox bears the burden of showing "positive assurances" via "forceful evidence suggesting that the parties intended to exclude the dispute[] at issue from arbitration." *Rite Aid of Pennsylvania, Inc. v. United Food & Commercial Workers Union, Local 1776*, 595 F.3d 128, 132 (3d Cir. 2010) (quotations omitted). This Circuit has held that "positive assurance" does not mean "absolute certainty," *PaineWebber Inc.,* 921 F.2d at 513, and that "a compelling case for nonarbitrability should not be trumped by a flicker of interpretive doubt." *Gay v. CreditInform*, 511 F.3d 369, 387 (3d Cir. 2007) (quotations omitted). Furthermore, the breadth of an arbitration provision is determined with special attention to the facts of the particular claims at issue. "To determine whether a claim falls within the scope of an arbitration agreement, the focus is on the

---

The presumption in favor of arbitrability does not apply to all arbitration provisions, even at step two of this inquiry, but I find that the presumption does apply to the "broad" arbitration provision at issue here. See *Local 827, Int'l Bhd. of Elec. Workers, AFL-CIO v. Verizon New Jersey, Inc.*, 458 F.3d 305, 311 (3d Cir. 2006) ("If the arbitration clause is clearly broad or ambiguous, we will apply the presumption of arbitrability. If the clause is not ambiguous and clearly delimits the issues subject to arbitration, the presumption of arbitrability does not apply.").

factual underpinnings of the claim rather than the legal theory alleged in the complaint." *Medtronic AVE, Inc.* 247 F.3d at 55 (quotations omitted).

The scope of arbitration provision at issue is limited to disputes "arising out of" the agreement. DSA § 17.B. Section 17.C of the agreement adds: "[b]oth parties shall have the right to seek assistance with disputes arising solely out of this Agreement using binding arbitration and/or mediation." DSA § 17.C. Blackshear contends that all of Lenox's claims are within the scope of the arbitration provision of the agreement, because of, Blackshear claims, Lenox's "erroneous belief that [Lenox] continues to hold rights to manufacture and sell goods" under the Ebony Visions Mark. Mot. to Stay 15, ECF No. 9. The central question is, therefore, from where did Lenox's "rights to manufacture and sell goods" under the Ebony Visions Trademark arise?

Blackshear seeks to arbitrate trademark claims premised upon an agreement that, at least in part, contemplates the right to sell or advertise products and the right to use a trademark. The DSA states that "for the Term of this Agreement . . . COMPANY shall have the right to use, manufacture, have manufactured, sell, distribute and advertise Products in the Territory." DSA §1.A. The agreement also plainly references intellectual property, including the Ebony Visions Mark.[11] *See* DSA §9; Schedule A ¶ 2, DSA. Blackshear presents a colorable argument that Lenox's ability to use the trademarks referenced in the agreement were limited to the term of the agreement itself. *See* DSA §9.A ("during the Term of this Agreement . . ."). There is no dispute that the DSA expired in 2013. Mot. to Stay 15.

---

[11] The full clause reads:
- A. Company shall seek, obtain, and, during the Term of this Agreement, maintain in its own name and at its own expense, appropriate intellectual property protection for the Property and Trademark.
- B. Designer agrees to execute any documents reasonably requested by Company to effect any of the above provisions.
- C. Designer shall acknowledge Company's exclusive rights in the Property and the Trademarks and acknowledges that the Property and/or the Trademark are owned by Company. Designer shall not dispute or contest, directly or indirectly Company's exclusive right and title to the Property and/or the Trademarks or the validity thereof.

There is also one reference in the agreement to a license. DSA §12 ("COMPANY shall have the right, in its discretion, to institute and prosecute lawsuits against third persons for the infringement of the rights licensed in this Agreement."). If one of the rights "licensed" in the agreement was the right to use the Ebony Visions Mark, then a trademark claim premised on the rightful ownership of that trademark arises under the agreement. Such a claim is subject to the arbitration provision.

Resolving all doubts in favor of arbitration, *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 24, it cannot be said with "positive assurances" that the DSA is not "susceptible to an interpretation" that governs this dispute. *AT & T Techs., Inc.*, 475 U.S. at 650 (quotations omitted). Lenox has not presented "forceful evidence" to overcome the presumption in favor of arbitration. *Lukens Steel Co*, 989 F.2d at 673.[12]

---

[12] Lenox contends that "even assuming [the DSA] did convey the Ebony Visions Mark to Thomas Blackshear upon expiration of that agreement, that trademark interest was long ago extinguished through the D56, Inc. bankruptcy." Mot. to Enjoin 4. But I do not look to the merits of the dispute, *Lukens Steel Co.*, 989 F.2d at 672, and therefore have not decided that the DSA functioned as a license or assignment. I have only decided that a dispute as to the ownership of the Ebony Visions Mark arises under the DSA. Whether or not a true assignment occurred will be for the arbitrator to determine.

## V.     CONCLUSION

For the reasons set forth above, Defendants' Motion to Stay is granted[13] and Plaintiff's Motion to Enjoin is denied.

s/Anita B. Brody

_____

ANITA B. BRODY, J.

Copies **VIA ECF** on _____ to:                    Copies **MAILED** on _____ to:

---

[13]     The Motion to Stay is granted with respect to all Defendants. Lenox argues that because Roger W. Rawls, Keepsakes and Collectables, LLC and Blackshear Enterprises, Inc., were not signatories to the 2004 DSA, they cannot be subject to the arbitration provision. Lenox asks me to only grant the stay with respect to Blackshear, the sole signatory. Defendants counter that Lenox is equitably estopped from avoiding arbitration with Rawls and the two corporate entities.

I find I am precluded from doing anything but granting the stay entirely. As the Supreme Court has recognized, nonparties to a contract are not categorically barred from relief under §3 of the FAA—"a litigant who was not a party to the relevant arbitration agreement may invoke § 3 if the relevant state contract law allows him to enforce the agreement." *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 632 (2009). Under California law, "allegations of interdependent and concerted misconduct by signatories and nonsignatories will justify allowing a nonsignatory to enforce an arbitration clause only . . . when the claims against the nonsignatory are inextricably bound up with the terms and duties of the contract the plaintiff has signed with the other defendant." *Goldman v. KPMG LLP*, 92 Cal. Rptr. 3d. 534, 547 (Cal. Ct. App.  2009) (quotation omitted).

Equitable estoppel is an awkward vehicle for Defendants to rely on here. The point of the doctrine is to prevent signatories from "hav[ing] it both ways; the signatory cannot on the one hand, seek to hold the non-signatory liable pursuant to duties imposed by the agreement, which contains an arbitration provision, but, on the other hand, deny arbitration's applicability because the defendant is a non-signatory." *Id*. at 220 (quotations omitted). Here, Lenox does not seek to hold Rawls and the two LLCs liable "pursuant to duties imposed by the agreement" because it argues the relevant duties have nothing to do with the agreement. Forcing Lenox to arbitrate with the non-signatory Defendants therefore seems contrary to the "linchpin for equitable estoppel[]—fairness." *Id*. Nonetheless, were I to deny the stay with respect to the non-signatory defendants, I would be deciding that Lenox's right to enforce the trademark and to sell the Ebony Visions line is sourced from something *other* than the 2004 DSA. I have found that this is for the arbitrator to determine.  Therefore, the Stay is granted with respect to all Defendants.